UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>JUSTIN JANGWOO KIM,<br><br>　　　　Defendant. | CR No. 20CR00154-CJC<br><br>I N F O R M A T I O N<br><br>[18 U.S.C. § 666(a)(2): Bribery Concerning Programs Receiving Federal Funds] |

The United States Attorney charges:

INTRODUCTORY ALLEGATIONS

At times relevant to this Information:

A.　RELEVANT PERSONS AND ENTITIES

　　1.　The City of Los Angeles (the "City") was a government that received more than $10,000 per fiscal year in funds from the United States, including from August 1, 2016 to July 31, 2017, in the form of grants, contracts, subsidies, loans, guarantees, insurance, and other forms of federal assistance. The City was split into fifteen City Council Districts ("CDs"), which covered different geographic areas. The City Council was composed of members who were elected from each district. City Councilmembers and their staff members were

agents of the City. All legislative power in the City was vested in the City Council and was exercised by ordinance, subject to a veto by the Mayor.

2. Defendant JUSTIN JANGWOO KIM was a real estate appraiser and consultant for real estate developers with projects in Los Angeles and a major fundraiser for Councilmember A.

3. Councilmember A was the Councilmember for a City Council District ("CD-A"). Councilmember A served on the Planning and Land Use Management ("PLUM") Committee, a body appointed by the City Council President that oversaw many of the most significant commercial and residential development projects in the City. Councilmember A also served on the Economic Development Committee.

4. City Staffer A-1 worked for the City on Councilmember A's staff in CD-A.

5. Developer C, owner of Company C, was a real estate owner and developer who owned commercial properties in the City, including a property held by Company C located in Councilmember A's District, purchased in 2008. Developer C and Company C were planning on building a residential complex on the property ("Project C").

6. Lobbyist B was a consultant for real estate developers with projects in the City and a major fundraiser for Councilmember A. Lobbyist B was a principal officer of Political Action Committee 1 ("PAC 1"), which was formed to benefit the campaign of a relative of Councilmember A for the CD-A seat.

7. Labor Organization A was an unincorporated association of individuals and labor organizations. Its members included labor unions.

8. Lobbyist C was a consultant and lobbyist for real estate developers with projects in the City and a close associate of the Executive Director of Labor Organization A.

B. BACKGROUND ON CITY PROCESSES

9. Within the City, large-scale development projects required a series of applications and approvals prior to, during, and after construction. These applications and approvals occurred in various City departments, including the City Council, PLUM Committee, the Economic Development Committee, the Los Angeles Planning Department, the Los Angeles Department of Building and Safety, the Area Planning Commission, the City Planning Commission, and the Mayor's Office.

10. Each part of the City approval process required official actions by public officials. These included entitlements, variances, general plan amendments, subsidies, incentives, public benefits, scheduling agendas for the various committees, and overall approvals. The process allowed for public hearings, feasibility studies, environmental impact reports, and other steps in the life of development projects.

11. Even for projects that were not going through the City approval process, City officials could benefit, or take adverse action against, a project by advocating for, pressuring, or seeking to influence other City officials, departments, business owners, and stakeholders.

12. Certain unions and labor organizations often used the California Environmental Quality Act ("CEQA") as a tool to pressure private developers to sign collective bargaining agreements, project labor agreements, maintenance labor agreements, labor neutrality agreements, and other union contracts. CEQA allowed unions and labor

organizations to file objections to Initial Studies, Mitigated Negative Declarations, and Draft and Final Environmental Impact Reports, which could delay a construction project and increase costs of environmental review and project development. In the City, CEQA objections were appealable to the PLUM Committee and the City Council.

C.   THE PROJECT C BRIBERY AGREEMENT AND PAYMENT

13.   Between August 2016 and July 2017, Developer C agreed to provide a $500,000 cash bribe to Councilmember A, through defendant KIM, in exchange for Councilmember A's assistance on Developer C's project, Project C. Developer C, through defendant KIM, initially provided $400,000 in cash that Developer C intended for Councilmember A between February and March 2017. Councilmember A directed City Staffer A-1 to hold on to $200,000 of the total bribe payment for Councilmember A. City Staffer A-1 and defendant KIM each kept a portion of the remaining $200,000 bribe payment for themselves. In exchange, Developer C, through defendant KIM and City Staffer A-1, sought to use Councilmember A's influence as the Councilmember of CD-A and member of the PLUM Committee to cause Labor Organization A to withdraw, abandon, or otherwise lose its appeal opposing Project C, thereby allowing Project C to move forward in its City approval process. In July 2017, Developer C provided defendant KIM the remaining $100,000 in cash intended for Councilmember A, which defendant KIM kept for himself.

14.   Specifically, in the summer of 2016, Labor Organization A filed an appeal requesting to suspend all activity to implement Project C that required City approval until Project C was brought into compliance with the requirements of CEQA by correcting certain

deficiencies (the "appeal"). The appeal prevented Project C from progressing through the rest of the City approval processes, including approvals by the PLUM Committee and City Council.

15. On August 8, 2016, Developer C asked defendant KIM to obtain Councilmember A's assistance to deal with the appeal, which could ultimately reach the PLUM Committee of which Councilmember A was a member.

16. On August 9, 2016, Developer C sent a copy of the appeal to defendant KIM by e-mail, which defendant KIM then forwarded to City Staffer A-1.

17. On September 1, 2016, defendant KIM, Councilmember A, City Staffer A-1, and another individual met for dinner and later visited a Korean karaoke establishment in Los Angeles. While at the karaoke establishment, defendant KIM asked Councilmember A for assistance with the appeal on Project C, and Councilmember A agreed to help. Defendant KIM then called Developer C and asked Developer C to join them at the karaoke establishment, which Developer C did.

18. On September 2, 2016, defendant KIM and City Staffer A-1 met for lunch in Los Angeles. At Councilmember A's direction, City Staffer A-1 expressed to defendant KIM that Councilmember A would not help Project C for free and that Councilmember A would require a financial benefit in exchange for help ensuring Project C moved forward through the City approval process.

19. On September 3, 2016, defendant KIM and Developer C met at a bowling alley in Little Tokyo. Defendant KIM conveyed to Developer C the message from Councilmember A and City Staffer A-1, namely that Councilmember A's assistance on Project C would require that Councilmember A receive a financial benefit.

20. On January 17, 2017, defendant KIM, Councilmember A, and Developer C's business associates met at Councilmember A's City Hall office to discuss, among other things, Project C. Shortly before the meeting, City Staffer A-1 sent defendant KIM a series of text messages, writing: "Let's you and I meet with [the] CM [Councilmember A] after to talk about [Project C]. Make those ask about ... [Labor Organization A]." Defendant KIM responded: "Yes." During a private portion of the meeting that included only defendant KIM, Councilmember A, and City Staffer A-1, defendant KIM again asked Councilmember A for assistance with the appeal, and Councilmember A responded that Councilmember A could help. Councilmember A also stated that Councilmember A wanted defendant KIM to be a major supporter when Councilmember A's relative ran for Councilmember A's seat as the councilmember for CD-A.

21. On January 18, 2017, defendant KIM and City Staffer A-1 met at a coffee shop in Little Tokyo. During this meeting, City Staffer A-1 told defendant KIM that Lobbyist C stated it would cost approximately $1.2 million to $1.4 million to hire a lobbyist to attempt to resolve the appeal and allow Project C to move forward in the City approval process. After this meeting, defendant KIM conveyed the cost of $1.2 million to $1.4 million to Developer C. Developer C made a counteroffer for Councilmember A to resolve the appeal for $500,000 in cash to Councilmember A.

22. In approximately February 2017, defendant KIM conveyed Developer C's counteroffer of $500,000 cash for Councilmember A to City Staffer A-1, who then conveyed this counteroffer to Councilmember A.

23. Between February 2, 2017 and February 10, 2017, defendant KIM had conversations with City Staffer A-1 and Developer C, including via text messages, discussing the negotiation of the bribe payment from Developer C to Councilmember A.

24. In or around February 2017, defendant KIM and City Staffer A-1 met at a restaurant in Los Angeles to discuss the bribe payment amount. Defendant KIM and City Staffer A-1 discussed that Developer C agreed to pay $500,000 in cash in exchange for Councilmember A's assistance in resolving the appeal so that Project C could move forward in the City approval process, including approvals by the PLUM Committee and City Council. Thereafter, City Staffer A-1 told Councilmember A that Councilmember A would collect $300,000 of the total $500,000 cash bribe payment.

25. In approximately February and March 2017, Councilmember A and City Staffer A-1 discussed the appeal on Project C. Councilmember A stated that Councilmember A had conveyed to Lobbyist C that Councilmember A had to support Project C, meaning that Councilmember A would oppose the appeal in the PLUM Committee. According to Councilmember C, Lobbyist C agreed to discuss the issue with the Executive Director of Labor Organization A.

26. On February 14, 2017, City Staffer A-1 had a text message conversation with Lobbyist C, about a private meeting with Councilmember A. Specifically, City Staffer A-1 wrote: "My boss [Councilmember A] asked if you guys can have a one on one on Tuesday at 830am?... Just you and the Councilman."

27. On February 22, 2017, City Staffer A-1 had a text message conversation with Lobbyist C, about another private meeting at Councilmember A's request. Specifically, City Staffer A-1 wrote: "Hi

7

[Lobbyist C], free tomorrow to meet?  Councilman asked me to meet with you."  Lobbyist C responded: "Yea.  Let me loop in [another individual]."  City Staffer A-1 then replied: "Cool.  But I still need to talk to you one on one per my bosses [Councilmember A] request."  Lobbyist C responded: "No problem.  Misunderstood."

28.  On March 1, 2017, City Staffer A-1 sent a text message to Lobbyist C regarding the appeal, asking: "Everything good?"  Lobbyist C then replied: "Think so, You?"  City Staffer A-1 responded: "Yes sir.. just checking in."

29.  On March 3, 2017, Lobbyist C sent City Staffer A-1 a text message informing City Staffer A-1: "Appeal [was] dropped today."

30.  Later that day, City Staffer A-1 informed defendant KIM that Councilmember A had held up Councilmember A's end of the bargain and resolved the appeal.  Soon thereafter, defendant KIM informed Developer C that Councilmember A held up Councilmember A's end of the agreement and helped resolve the appeal.

31.  In approximately February or March 2017, defendant KIM met with Developer C at a commercial building in Los Angeles and received a paper bag from Developer C containing $400,000 in cash, which was intended to be a bribe Developer C agreed to pay for Councilmember A's assistance in resolving the appeal.  After receiving $400,000 in cash from Developer C, defendant KIM met with City Staffer A-1 in a car in Los Angeles, and gave City Staffer A-1 cash to deliver to Councilmember A.  Defendant KIM kept some cash for himself for facilitating the bribe payment.

32.  On March 14, 2017, at 4:48 p.m., City Staffer A-1 sent a text message to Councilmember A, asking: "Are you home?"

Councilmember A responded: "Yes." City Staffer A-1 then wrote: "Can I stop by? Just finished meeting with JUSTIN [KIM]."

33. On March 14, 2017, at approximately 5:15 p.m., Councilmember A and City Staffer A-1 met at Councilmember A's residence. City Staffer A-1 told Councilmember A that Developer C had provided $400,000 in cash to date, and that Developer C would provide the remaining $100,000 later. City Staffer A-1 stated that defendant KIM had provided $200,000 of that cash to City Staffer A-1 to date. At the meeting, City Staffer A-1 showed Councilmember A a liquor box filled with approximately $200,000 cash. Councilmember A told City Staffer A-1 to hold on to and hide the money at City Staffer A-1's residence until Councilmember A asked for it.

D.  **DEFENDANT KIM'S FURTHER PROFIT FROM THE PROJECT C BRIBERY SCHEME**

34. In order to continue to profit from the bribery scheme, in or around July 2017, defendant KIM falsely told Developer C that Councilmember A asked for the remaining $100,000 bribe payment. Developer C agreed to provide the remaining $100,000 of the agreed-upon $500,000 bribe to be paid to Councilmember A for resolving the appeal. Defendant KIM met with Developer C at an office in Los Angeles and received an additional $100,000 in cash from Developer C. Defendant KIM kept this money for himself.

35. Defendant KIM failed to declare any of the cash he received from Developer C for his role in facilitating the Project C bribery scheme on his federal income tax return for 2017, as required.

E.  **DEFENDANT KIM'S SUPPORT FOR COUNCILMEMBER A AND COUNCILMEMBER A'S RELATIVE**

36. During the bribery scheme, defendant KIM and City Staffer A-1 strategized ways to protect Councilmember A to ensure

9

Councilmember A's power and relevance within the City, including repeatedly discussing being loyal to Councilmember A, because it meant securing future financial opportunities for defendant KIM and City Staffer A-1. Defendant KIM frequently referred to Councilmember A as defendant KIM's "boss."

37. Defendant KIM supported City Staffer A-1's and Councilmember A's succession plan that would maintain or increase financial opportunities for them after Councilmember A's term as councilmember of CD-A expired. These discussions included plans to elect Councilmember A's relative for the CD-A seat, ensuring political control for them and their allies, and developing the Project C bribery scheme in CD-A. On multiple occasions, defendant KIM discussed with City Staffer A-1 the need to ensure Councilmember A's relative was elected for their own political and financial benefit and their own long-term plan.

38. On April 15, 2017, in a telephone call between defendant KIM and City Staffer A-1, they discussed their common purpose in ensuring that Councilmember A remained in power and that Councilmember A's relative succeeded Councilmember A. Specifically, defendant KIM stated: "But more importantly, [City Staffer A-1], your interests, my interests, that's what I told everyone, alright? We want to make sure [Councilmember A's relative] gets elected."

39. On April 17, 2017, in a telephone call between defendant KIM and City Staffer A-1, they again discussed their common purpose in ensuring that Councilmember A remained in power. Specifically, defendant KIM stated: "[T]hat's why we can't make mistakes with [Councilmember A] from now on." City Staffer A-1 responded: "Well,

we got to, uh, protect the ship, right, from sinking itself." Defendant KIM affirmed.

40. On April 28, 2017, in a telephone call between defendant KIM and City Staffer A-1, they discussed their long-term plan to maintain their own political and financial interests. Specifically, City Staffer A-1 stated: "[Councilmember A's relative] wins, we have another twelve years in the City." Later in the same call, City Staffer A-1 stated: "You and I have a twenty year plan and we got to where we want to be." Defendant KIM responded: "[T]hat would be ideal."

41. On May 2, 2017, in a telephone call between defendant KIM and City Staffer A-1, they discussed their commitment to Councilmember A and confirming they all knew they were working towards a common purpose. Specifically, defendant KIM stated: "[W]e're the most loyal guys." City Staffer A-1 responded: "I think it's important to tell [Councilmember A], like, 'Look boss, we're your loyal people.' ... [W]e've showed our loyalty, you've showed your loyalty."

42. On or around June 22, 2017, defendant KIM met with Councilmember A, City Staffer A-1, and Lobbyist B to discuss establishing two political action committees ("PACs") to raise money for the campaign of Councilmember A's relative. During this meeting, Councilmember A suggested having defendant KIM find an associate to serve as the "face" of one of the PACs to disguise Councilmember A's involvement and the PAC's connection to CD-A.

F.  DEFENDANT KIM'S ACTIONS SHOWING HIS CONSCIOUSNESS OF GUILT

43. On May 18, 2017, the FBI conducted a voluntary interview of defendant KIM regarding a public corruption investigation. During

the interview, defendant KIM minimized his close relationship with City Staffer A-1 and the frequency with which they communicated with each other. During the interview, the FBI told defendant KIM about an ongoing grand jury investigation and asked defendant KIM not to reveal the interview to others because it may negatively impact the federal grand jury investigation. Defendant KIM told the FBI he agreed not to reveal such information to others.

44. Nevertheless, on May 18, 2017, approximately one hour after the first FBI interview, defendant KIM called City Staffer A-1 and informed City Staffer A-1 that he talked to the FBI. Defendant KIM told City Staffer A-1 that the FBI "know[s] exactly who you are," that the FBI had conducted surveillance at one of City Staffer A-1's local hangouts, and warned City Staffer A-1: "Don't take our boss [Councilmember A] over there."

45. On July 10, 2017, the FBI conducted a second voluntary interview of defendant KIM. Defendant KIM falsely stated that he did not tell anyone that he met with the FBI, other than his wife and Friend A. Among other things, defendant KIM also falsely stated that: (1) he had not asked anything from anyone in City Council and (2) he never provided any type of benefits including money or items to City Staffer A-1.

46. On July 11, 2017, in a telephone call, defendant KIM told City Staffer A-1 that he had a second interview with the FBI. City Staffer A-1 warned that "you might not want to talk on the phone." Defendant KIM disclosed that the FBI had photographs of City Staffer A-1 and defendant KIM. Defendant KIM then stated: "Just letting you know, [City Staffer A-1]. This is one place I didn't want us to be."

47. The next day, on July 12, 2017, defendant KIM and City Staffer A-1 met in person in a car near City Staffer A-1's residence, and then drove around in the car. During this meeting, defendant KIM and City Staffer A-1 discussed the FBI investigation.

48. On or about March 20, 2019, after the FBI seized defendant KIM's phone pursuant to a federal search warrant, defendant KIM met Developer C at a coffee shop in Little Tokyo to discuss their concerns regarding the FBI investigation. Defendant KIM disclosed to Developer C that he told his attorney about the $500,000 bribe payment to Councilmember A. Developer C got upset and told defendant KIM he should have lied to the attorney. Developer C stated that now the two could not match stories.

G. COUNCILMEMBER A SEEKS TO COLLECT THE PROJECT C BRIBE PAYMENT FROM CITY STAFFER A-1

49. On December 28, 2017, Councilmember A and City Staffer A-1 met at City Hall, in Councilmember A's private bathroom, to discuss various topics, including the cash bribe City Staffer A-1 was holding for Councilmember A. Councilmember A mentioned that Councilmember A had "a lot of expenses" because Councilmember A's relative was running to be the councilmember for CD-A. Councilmember A stated: "I'm gonna need money." Councilmember A referred to the $200,000 cash bribe payment that Councilmember A asked City Staffer A-1 to keep at City Staffer A-1's residence, stating: "That is mine, right? That is mine." City Staffer A-1 responded: "Yup." Councilmember A and City Staffer A-1 agreed to wait until April 1, 2018, for City Staffer A-1 to provide the $200,000 cash to Councilmember A, to allow some cooling off period after City Staffer A-1's interviews with the FBI during the summer.

50. In or around April 2018, Councilmember A and City Staffer A-1 communicated by telephone and agreed to postpone their meeting to deliver Councilmember A's bribery cash to October 1, 2018.

51. In or around September and October 2018, Councilmember A sent City Staffer A-1 a series of unanswered text messages regarding the October 1, 2018 meeting and expected delivery of Councilmember A's cash bribe. Specifically, on September 30, 2018, Councilmember A wrote: "Hey [City Staffer A-1]. Tomorrow is October first. When we gonna meet?" On October 4, 2018, Councilmember A wrote: "Hey [City Staffer A-1]. So we gonna meet up like u said we would after October?"

52. On October 5, 2018, defendant KIM and Councilmember A met at a hotel in Pasadena. Councilmember A asked defendant KIM to turn off his cellphone during the meeting to ensure their meeting was not recorded. Councilmember A stated that Councilmember A had not gotten Councilmember A's share and held up two fingers, referring to the $200,000, which was Councilmember A's share of the bribe payment from Developer C in exchange for Councilmember A's help with the appeal. Councilmember A explained that Councilmember A did not get Councilmember A's share of the bribe payment because City Staffer A-1 was still holding on to the cash.

53. Councilmember A continued to try to meet with City Staffer A-1 to obtain Councilmember A's portion of the bribe proceeds. On October 14, 2018, Councilmember A sent a text message to City Staffer A-1, writing: "[City Staffer A-1]. I've been trying to connect with you. We have a meeting that was supposed to occur on October 1." On October 20, 2018, Councilmember A wrote: "[City Staffer A-1]. I've been trying to reach u. When are we going to meet and square up?"

On October 22, 2018, Councilmember A wrote: "Sounds like u don't ever want to meet and face up to your commitment to meet on October 1 and u are using other pretexts as to why u don't want to meet. You are using excuses as for the real reason u don't want to meet and u know it. U told me October. Now What? Each time comes up and u don't want to meet at all? U want it all and that's the real reason why you don't want to meet and are using all kind of excuses. One more time, when are we going to meet?"

## COUNT ONE

[18 U.S.C. § 666(a)(2), § 2(a)]

54. From on or about August 8, 2016 to approximately July 2017, in Los Angeles County, within the Central District of California, defendant JUSTIN JANGWOO KIM, both individually and aiding and abetting Developer C and others known and unknown to the United States Attorney, corruptly gave, offered, and agreed to give things of value to Councilmember A and City Staffer A-1, both agents of the City of Los Angeles, intending to influence and reward Councilmember A and City Staffer A-1 in connection with business, transactions, and series of transactions of the City of Los Angeles, having a value of $5,000 or more. Specifically, defendant KIM, on behalf of Developer C, corruptly gave, offered, and agreed to give to Councilmember A and City Staffer A-1 $500,000 in cash, intending to influence and reward Councilmember A and City Staffer A-1 in connection with Councilmember

//
//
//
//
//
//
//
//
//
//
//
//
//

A and City Staffer A-1 using their official positions to assist Developer C and Company C in connection with Labor Organization A's appeal opposing Project C in the PLUM Committee.

NICOLA T. HANNA
United States Attorney

*Brandon Fox*

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

MACK E. JENKINS
Assistant United States Attorney
Chief, Public Corruption and
   Civil Rights Section

VERONICA DRAGALIN
Assistant United States Attorney
Public Corruption and Civil
   Rights Section